## KUHNERT v. UNITED STATES.

### No. 44.

District Court, W. D. Missouri, St. Joseph Division.

Jan. 23, 1941.

Alva Lindsay and Lewis Kranitz, both of St. Joseph, Mo., for plaintiff.

Charles Lamkin, Jr., Asst. U. S. Atty., of Kansas City, Mo., for defendant.

OTIS, District Judge.

This suit was authorized under a special act of Congress approved August 11, 1939, 53 Stat. 1543. The text of this Act is set out in the margin [1]. The act was passed in the interest of a number of farmers owning and cultivating lands along the Missouri River near a point where the government had constructed certain dikes and revetments. The farmers claimed that because of the defective construction and the improper placing of the dikes and revetments a flood resulted which overflowed their lands and damaged and destroyed property belonging to them. The date of the flood was March 6-7, 1934. Plaintiff sues for himself and others of the farmers concerned, whose causes of action have been assigned to plaintiff.

Plaintiff's theory is that a dike was constructed from the Kansas bank of the river to a point near the Missouri bank; that the end of the dike was so near the Missouri bank and the course of the river at the end of the dike was turned so sharply upon itself as that a normal flow of ice jammed the river at that point, dammed the waters, and raised the level of the river with the resulting over-flow and damage.

It is important that we should understand what was accomplished and intended to be accomplished by the special Act. For that purpose our attention need be given only to the first sentence of Section 1. That sentence is "That notwithstanding the lapse of time or any provisions of law to the contrary jurisdiction is hereby conferred upon the District Court of the United States for the Western District of Missouri to hear, determine, and render judgment without interest, but with costs, under and in accordance with the same provisions of law as if the United States were a private party upon the claims of the following-named people."

---

[1] "An Act To confer jurisdiction on the District Court of the United States for the Western District of Missouri to hear, determine, and render judgment upon the claims of certain claimants who suffered loss by flood at or near Bean Lake in Platte County, and Sugar Lake in Buchanan County, in the State of Missouri, during the month of March 1934.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That notwithstanding the lapse of time or any provisions of law to the contrary jurisdiction is hereby conferred upon the District Court of the United States for the Western District of Missouri to hear, determine, and render judgment without interest, but with costs, under and in accordance with the same provisions of law as if the United States were a private party upon the claims of the following-named people or their heirs, representatives, administrators, executors, successors, or assigns: G. M. McCrary, Paul N. Shouse, Emma Shults, Mrs. C. E. Johnson, Mrs. A. H. Wilber, G. E. Hutson, Elmer Willis, Ethel McDuff, W. J. Huter, W. C. Hood, J. P. Kuhnert, Florence O. Saunders, E. Cobb, James D. Kelly, W. H. Myers, Dora Weldin, Frank Dougherty, M. H. Whitnah, Charles C. Myers, H. A. Whitnah, W. F. Reese, George Willis, N. D. Gasaway, Paul Johnson, Harry Turpin, John H. Chapin, J. D. Fraizer, C. W. Pierson, L. K. Poos, Lula A. Jegglin, Mrs. E. T. Graham, A. F. Russell, E. O. Keene, H. F. Chapin, Goldie Noland, Mrs. Goldie Noland, B. F. Kabel, Oscar Swearinger, Argyle Reese, S. O. Daniels, Belle Wagner, and W. D. Shreve. Said claims arise out of a flood allegedly resulting from the defective or improper placing and construction of dikes or revetments in the Missouri River by the War Department of the United States, at or near Bean Lake in Platte County, and Sugar Lake in Buchanan County, in the State of Missouri, in the month of March 1934. Suit hereunder may be instituted at any time within one year from the date of the enactment of this Act, and proceedings therein, appeals therefrom, and payment of judgment thereon, if any, shall be had in the same manner as in the case of claims over which such court has jurisdiction under the provisions of the Judicial Code.

"Sec. 2. The United States district attorney for the western district of Missouri is hereby charged with the duty of defending the United States in any suit instituted under the authority of this Act.

"Sec. 3. There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary to pay judgments under this Act. Such amounts shall be paid by the Secretary of the Treasury when the judgment of the district court has become final and on presentation to the Secretary of a duly authenticated copy of the judgment. Such payment shall be in full settlement of all claims against the United States on account of claims arising out of such flood damage.

"Approved, August 11, 1939."

■ The first part of this sentence presents no difficulty. Undoubtedly it refers to any limitation as to the time within which an action against the United States must be brought, and to the limitation upon the jurisdiction of district courts set out in Section 41, Subsection 20, Title 28, United States Code Annotated.

■ For the purposes of this Act both types of limitation are set aside. Unquestionably Congress had the constitutional power to set aside these limitations in any suit brought against the United States. Learned counsel here perceive no difficulty in the first part of this sentence. They disagree as to the meaning of the second part of the sentence: "Jurisdiction is hereby conferred upon the District Court * * * to hear, determine, and render judgment * * * under and in accordance with the same provisions of law as if the United States were a private party upon the claims of the following-named people."

The contention of learned counsel for plaintiff touching this provision is—I quote from their trial brief: "There is no ambiguity in this language. It is plain and simple and needs nothing read into it. It simply eliminated defenses that might be available to the government that are not available to a private person such as governmental functions and immunity as sovereign."

Opposed to that view is that of defendant's learned counsel that the only effect of the provision was to give the District Court jurisdiction to entertain a suit in tort against the United States.

■ It is well established that a suit against the United States must be "clearly within * * * the statute by which it consents to be sued". United States v. Michel, 282 U.S. 656, 659, 51 S.Ct. 284, 285, 75 L.Ed. 598. Doubts in construing such a statute will be resolved therefore in favor of the United States. We must consider this statute with that rule in mind.

■ Another rule firmly established which, also, we must have in mind, is that in construing a statute doubts, if any, will be so resolved as that the statute will be constitutional.

■ The United States District Court is one of the constitutional courts. Within the constitutional limits, the jurisdiction of districts courts is determined by Congress, —in what geographical area they shall function, with respect to what classes of cases they shall exercise judicial power. But the judicial power is conferred upon the district courts not by Congress, but by the Constitution. To determine what is the law applicable to a case, to apply that law to the case, to render judgment accordingly, these things are of the very essence of the judicial power. It is not conceivable that Congress ever would say to the constitutional courts (such legislative courts as the Court of Claims may be in a different situation): "Congress has decided what rule of law will govern the decision of this case; the court will pronounce judgment accordingly".

To illustrate, let us assume the case of A vs. United States, a war risk insurance case. The prime questions in the case are: Was A regularly enlisted; did he apply for war risk insurance; was he totally and permanently disabled on January 1, 1925? These are questions to be decided upon the law and the evidence under and by the judicial power. Congress would not usurp the judicial power by specially legislating as to that particular case that the district court should find as a fact that A was an enlisted man, although the evidence might be to the contrary, or that in that case the rule against hearsay evidence should not be enforced or that the district court should not apply the law applicable to the actual contract but should apply the law applicable to an entirely different character of contract. Congress would not so legislate and no judge, having respect for the judicial oath, would obey such legislation if enacted.

■ The interpretation learned counsel for plaintiff would put upon this special statute does violence to the elementary constitutional principles here indicated. Counsel would have this district court find as a fact that the United States is not a sovereign with sovereign rights and powers, it is a private person (and that in the very teeth of the truth); would have this district court declare that the law admittedly applicable, when the dikes were constructed, should not be applied in determining defendant's liability, but that an entirely inconsistent law, retroactively made applicable to this one case, should be declared and made applicable here. It is an interpretation which should be placed upon the statute only if it is inescapable.

The only powers Congress had which anyone can point to as supporting this

special Act are these: (1) The power to describe the jurisdiction, not the judicial power, of the inferior courts; (2) the power to give consent to the institution of suits against the United States and to limit that consent, but not to limit the judicial power.

The reasonable interpretation . of this special statute is this: It was the intention to confer jurisdiction on the district court which otherwise was not conferred. Express statutes deny such jurisdiction, hence the language "notwithstanding any provisions of law to the contrary." But, it was not enough to strike out these statutes. If only that were done remaining parts of the jurisdictional statute would not include such a case as this. It was deemed desirable to make it clear that so far as the matter of jurisdiction is concerned the position of the United States is that of a private party in any case brought pursuant to this statute. The clearly intended meaning would have been more clear if the. phrase "concerning jurisdiction", certainly implied, had actually been written, so that we would have had "Jurisdiction is hereby conferred upon the District Court of the United States to hear, determine and render judgment without interest but with costs under and in accordance with the same provisions of law concerning jurisdiction as if the United States were a private party."

A second possible interpretation is that the phrase "under and in accordance with the same principles of law as if the United States were a private party" refers to the immediately preceding phrase—"with costs." Consent is given to the imposition of costs against the United States under and in accordance with the same principles of law as if the United States were a private party.

Either of these interpretations is reasonable and with either the Act is both favorably interpreted for the United States, as the law requires, and interpreted so as to be valid, as the law requires. The interpretation urged by plaintiff's learned counsel not only results in an invalid attempt at usurpation by Congress of judicial power and in retroactive legislation against a firmly established presumption, but also in absurdity.

If the liability of the United States is to be determined as if it were a private party then it had no right to build any dike of any kind in the Missouri River, whether it was a good dike or a bad dike, whether it was constructed in accordance with the best engineering standards or otherwise. If in this instance the defendant is a private party it was a trespasser and its every act was unlawful. If its sovereign character be disregarded it was not even a riparian owner. It is liable, if it is a private party, for any damage it caused the plaintiff or his assignors. Not only is it deprived of the defense arising from its sovereign character, but it cannot defend even on the ground that it used every known feasible precaution. It is true that learned counsel do not go so far as to say the defendant had no rights in the river. They are not quite willing to regard defendant as one whose rights are only those of a private party.

My considered view is that Congress intended by this Act to give this court jurisdiction of this case that it might be judicially determined whether under any law . applicable to the defendant, whether of implied contract or tort or quasi-tort, the defendant is legally liable to the plaintiff and his assignors, and if so in what amounts. I do not think Congress intended to say to any constitutional court how it should decide a case. I do not think it intended to say that the United States should be dealt with in any case as a private party. I do not think it intended to declare that the rights and liabilities of the sovereign should be determined by the laws of Missouri which Congress did not enact and cannot modify.

### Findings of Fact [2].

1. Prior to the completion of the dikes in 1933, the main channel of the Missouri River in the vicinity of Oak Mills, Kansas, and adjacent thereto, ran down

[2] I consider that it is a possibility, although I have concluded that that possibility is not the fact, that Congress really did intend that the District Court of the United States should be an investigating body for Congress and should determine merely whether plaintiff and the assignors of plaintiff were damaged by reason of the fact that the dikes and other government work referred to in the evidence were constructed. While I refuse in any formal fashion to discharge any such function, as the courts have refused to discharge merely administrative functions since the beginning of the government, believing that it is their duty to preserve the independence and the integrity of the courts, nevertheless I shall be very glad to be of

and along the high bank on the Missouri side, and when it reached a point a short distance below Oak Mills, it turned southerly and crossed over to the high bank on the Kansas side of the river at a point some distance below, and said river was made up at that point of several channels.

2. In the year 1933, the defendant constructed some dikes in the Missouri River at or near Iatan Bend a short distance below Oak Mills, Kansas, the upper end of which connected with a spur dike which in turn connected with the high bank of the Missouri River on the Kansas side; said dikes so constructed in 1933 ran down and across the main channel of the Missouri River to a point within 350 feet of the high bank on the Missouri side of the river; and said dikes so constructed were built at nearly right angles to and across the dominant channel of said river for the purpose of causing a change in the main channel of the river, thereby causing it to run down along the upper side of the dikes and into a slough that ran along the northeast side of an island in the Missouri side of the river.

3. It was intended by this method to cause the dominant or main channel of the river to flow down to the end of the dikes and then proceed down through a slough along the Missouri high bank and northeast or back of an island adjacent to the Missouri high bank, but no pilot channel was provided through the slough. The main body of the water flowed down along the dikes to the end thereof and then, instead of flowing through the slough, turned abruptly back to the former channel of the river. At no time did the main channel of the river run down through the slough as was intended, nor did it erode the slough for that purpose as was intended.

4. These dikes were constructed by the defendant to provide what the engineers in charge considered was an improvement for navigation purposes only of the river.

5. The channel of the river just above the upper end of the dikes was about 1,250 feet wide; the channel of the river at the upper end of the dikes was about 950 feet wide; the channel of the river at the lower end of the dikes was to be, after completion of the dikes, between 200 and 300 feet wide, and the lower end of the dikes were between 200 and 300 feet of the mouth of the aforementioned slough.

6. The top of these dikes was within a foot of the top of the high bank of the river on either side, or approximately 12 to 13 feet above mean low water level; it was intended that the dikes would ultimately, by catching debris and filling in with silt or sediment, fill up the river along the dikes to about the height of the dikes; this caused a constriction in the channel of the river and interfered with the free flow of the river so that the water was required to pass in a channel approximately one fourth the normal width of the former channel.

7. Subsequent to the flood in 1934, hereinafter mentioned, and in the year 1935, the defendant removed a section of the longitudinal dike for a distance of about one fourth of a mile and allowed the main channel of the river to flow back into its former channel; in addition thereto and at about the same time of the removal of the dike the defendant abandoned the lower end of the dike for the purpose for which it was intended and constructed another series of dikes or revetments which prohibited the water from running into this slough or chute where it was formerly intended to run under the original plan, and on the contrary caused it to fill up with sediment and by such dikes and revetments diverted the water back to the opening in the longitudinal dike where a part of it had been removed and near the channel of the river prior to the making of the improvements; that the new plan appears to be feasible and practicable and provides a shorter bend and a better flow of water.

8. In March, 1934, and at a time when these dikes as originally planned were in place, there was a rise in the river a con-

help and aid to the plaintiff and the plaintiff's assignors. I shall be happy if the Congress shall discover in the findings of fact that I make a basis for some relief to the plaintiff and his assignors. Accordingly I have made full findings. I have had in mind, of course, that the burden of proof is on the plaintiff to prove his case by the preponderance or greater weight of the credible testimony but I have resolved doubts, which were not sufficient to threaten the balance, in favor of the plaintiff and plaintiff's assignors. I have done that where it was possible to do that. I have used the suggested findings of fact which learned counsel for the plaintiff have submitted as the ground work for my findings. I have used the exact language in many instances and if I have made any change at all it has been by way of omission and not by alteration. To the findings for which I have used the suggested findings I have added one framed entirely by myself.

siderable distance above these dikes to a point about nine feet above mean low water level; the high water maintained about the same height as it passed a number of government water gauges as it came down the river; this high water carried with it ice and debris. This height of water, in the absence of any obstruction or retarding of its flow would have passed plaintiff's and his assignors' properties well below the flood or bank full stage of the river. A rise of this character, and of its approximate height had on many occasions before March, 1934, gone down the river and had not overflowed any of this valley. The river carried about the normal amount of ice for that time of year. There had been no previous blocking or gorging of ice in the river at the point where these dikes were constructed. This rise of March 6, 1934, came down the river and passed Oak Mills, and was constricted into the space between the dikes and the high bank on the Missouri side of the river and began piling up the ice at the lower end thereof, and continued until the gorge of ice reached a distance of more than two miles up the river and the water reached a height of between seven and eight feet above that which was caused by the high water. This blocking or gorging action caused the water to flow over the high banks between two and three miles up the river and across claimants' properties to a maximum depth of about four feet. It covered about 3,500 acres of productive farm lands, and it was this water which caused the damage to plaintiff's and claimants' properties.

9. The entire overflow occurred above the lower end of the dikes and none of any consequence below the dikes, although the ground levels are relatively the same.

10. The dikes constructed and placed in the manner mentioned and under the circumstances then existing were the direct and proximate cause of the resultant flood.

11. I find that the plaintiff, Kuhnert, sustained a loss in the amount of $1,538.75; that his assignor, G. M. McCrary, sustained a loss in the amount of $240; that his assignor, Paul N. Shouse, sustained a loss in the amount of $2,775; that his assignor, Mrs. C. E. Johnson, sustained a loss in the amount of $4,235.46; that his assignor, Mrs. A. H. Wilbert, sustained a loss in the amount of $797.90; that his assignor, G. E. Hutson, sustained a loss in the amount of $127; that his assignor, James D. Kelly, sustained a loss in the amount of $8,806; that his assignor, W. H. Myers, sustained a loss in the amount of $693.22; that his assignor, Frank Dougherty sustained a loss in the amount of $956.75; that his assignor, H. A. Whitnah, sustained a loss in the amount of $858.20; that his assignor, N. D. Gasaway, sustained a loss in the amount of $134.75; that his assignor, Paul Johnson, sustained a loss in the amount of $206.08; that his assignor John H. Chapin, sustained a loss in the amount of $250; that his assignor, L. K. Poos, sustained a loss in the amount of $692.77; that his assignor H. F. Chapin, sustained a loss in the amount of $785.50; that his assignor Mrs. Goldie Noland, who is the same person as Goldie P. Noland, sustained a loss in the amount of $783.17; that his assignor, B. F. Kabel, sustained a loss in the amount of $497; that his assignor, S. O. Daniels, sustained a loss in the amount of $2,395; that his assignor, W. D. Shreve, sustained a loss in the amount of $667.50; that his assignor, Elmer Willis, sustained a loss in the amount of $1,011.90; that his assignor, Mrs. Ethel McDuff, sustained a loss in the amount of $1,426; that his assignor, Emma Shults, sustained a loss in the amount of $981.55.

12. The dikes and other government work referred to in the pleadings, in the evidence and in the preceding findings of fact were constructed for the purpose of improving the navigation of the Missouri River by competent engineers in accordance with the best engineering principles then known and in the light of all the knowledge accessible at the time, in a careful and prudent manner. The engineers who constructed and supervised the construction of these dikes had no reason to apprehend that they would not successfully accomplish their intended purpose nor that they would cause the overflow of the lands of plaintiff and his assignors.[3]

---

[3] I have made full findings of fact, not only for the reason that I stated in a preceding foot note, but also for the purpose of enabling the plaintiff to have a review of the judgment and decree of this court without going to the expense of having transcribed the whole record in this case. I have thought that if full findings of fact were made and the court's theory and conclusion of law were stated, that then the plaintiff could have a review at small cost. If the defendant desires to question the Court's findings of fact, then of course it may have the record transcribed.

804

### Conclusion of Law.

■ Upon the pleadings and the evidence introduced I conclude as a matter of law that the plaintiff is entitled to recover nothing from the defendant.

To this conclusion of law the plaintiff is allowed an exception.

### Judgment and Decree.

This cause coming on to be heard upon the pleadings, the evidence introduced, the written and oral argument of counsel, and the Court having made findings of fact and announced a conclusion of law, and being fully advised in the premises,

It is by the Court ordered, adjudged and decreed that the plaintiff have and recover nothing from the defendant and that the costs of this proceeding be assessed against the plaintiff.

An exception to the decree and judgment is allowed to the plaintiff.